COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                        NO.
 2-07-135-CV

 

 

IN THE INTEREST OF E.W.A., A CHILD                                                   

 

 

                                                                                                        

 

                                              ------------

 

           FROM
THE 323RD DISTRICT COURT OF TARRANT COUNTY

 

                                              ------------

 

                                MEMORANDUM
OPINION[1]

 

                                              ------------








        Joshua A. and Stephanie A. appeal from
the trial court=s order
terminating the parent-child relationship between them and their son, E.A,
following a bench trial.  In separate
briefs, Appellants both challenge the trial court=s decision to permit the Department of Family and Protective Services
(Athe Department@) to amend
its petition with regard to Joshua less than seven days before trial and the
factual sufficiency of the evidence to support the trial court=s section 161.001(1) and best-interest findings.  See Tex.
Fam. Code Ann. '  161.001
(Vernon Supp. 2007).  Joshua also
challenges the legal sufficiency of the evidence to support the trial court=s section 161.001(1) findings.  See
id.  We affirm.

                                       Factual Background

E.A. was born on September 4,
2004.  Stephanie has five older children
of whom she has given up or lost custody, and Joshua has another child, A.A.,
with whom his parent-child relationship was previously terminated. 








Stephanie has had an illegal
drug problem since the birth of her first child in 1988.  In 1999, her third child tested positive for
marijuana at birth; in 2001, her fourth child tested positive for amphetamine
at birth; and in 2002, her fifth child tested positive for both marijuana and
methamphetamine at birth.  During the
pendency of this case, Stephanie submitted to six out of the twelve drug tests
requested by the Department.  (She denied
that the Department had requested twelve tests.)  One of the hair-follicle tests to which she
did submit came back positive for methamphetamine five months before trial;
Stephanie admitted that she had relapsed on methamphetamine.  Another test, a urinalysis, was reported as Aoff-temp,@ meaning
that the urine sample did not come from Stephanie=s body at the time of the test. 
When Stephanie submitted the Aoff-temp@ sample, the
drug-testing lab asked her to drink some water and submit another urine sample,
but she left the test site instead. Stephanie=s mother testified that Stephanie told her she had smoked marijuana as
recently as February 14, 2007, six weeks before trial.  A hair follicle test conducted about a week
before trial was negative, which indicated that Stephanie had not used drugs
for the prior ninety days. 








Joshua also had a drug
problem.  Joshua testified that he has
used marijuana off and on since high school and methamphetamine since he was
fourteen years old.  Of the twelve drug
tests requested by the Department during the pendency of this case, Joshua
submitted to seven.  A hair follicle test
came back positive for methamphetamine use in November 2006; Joshua said that
was because he had been associating with people who smoke methamphetamine.  He tested positive for marijuana in January
2007.   The Department asked both
Stephanie and Joshua to attend a Department-approved drug treatment program as
a part of their service plans.  Neither
of them attended an approved program, but both had completed an unapproved,
church-sponsored drug/alcohol class called AACTS@ by the time
of trial.  The class=s teacher, Dean Cashen, who is not a licensed chemical dependency
counselor, described the class as Anot a 12-step class . . . it=s a 12-lesson class.@  Cashen said that anyone who
attended twelve lessons would receive a certificate of completion.  Stephanie and Joshua began attending the
classes, then stopped for six or eight weeks, and then resumed attendance;
Cashen was Avery
comfortable@ that they
attended at least twelve lessons, including those before and after the
hiatus.  Stephanie and Joshua had already
started taking the classes when they tested positive for methamphetamine in
November 2006.  Cashen testified that it
was very unsafe for parents of small children to use drugs. 

Stephanie changed residences
frequently between E.A.=s birth and
the termination trial.  She and Joshua
were living together in Colorado when E.A. was born.  Sometime after E.A.=s birth, and while the three were still living in Colorado, Joshua was
convicted of assaulting Stephanie. 
Joshua, Stephanie, and E.A. moved in with Stephanie=s cousin in Grand Junction, Colorado, for a short time, and then they
moved to Rusk, Texas, when E.A. was four or five months old.  When E.A. was seven months old, Stephanie
left Joshua and moved to Oklahoma without telling him where she was going;
Joshua explained that she left because Awe were arguing and fighting,@ and he was arrested for domestic violence against Stephanie. 








Four or five months later,
Stephanie moved to Fort Worth with E.A. to live with her father, Tom
Weaver.  Later that month, in August
2005, the Department received a referral stating that E.A., who was eleven
months old, had been left unattended on a balcony outside a third-floor room at
the Best Budget Motel in Fort Worth. 
Stephanie testified that she was living at the motel for a week because
she Aneeded a break@ or Avacation@ from her
father, with whom she Areally
clash[ed] sometimes.@  She could not explain how E.A., who could
crawl but not walk, had escaped from the room; Stephanie said that she was
taking a nap at the time, but denied having used drugs.  The Department was unable to find Stephanie
or E.A. at the motel. 

After the motel incident,
Stephanie and E.A. moved back in with her father.  Sometime after that, she moved in with
Michael Seay, a former boyfriend and convicted felon.  

In December 2005, the
Department received another referral regarding E.A.  This referral concerned reports of drug use
and an allegation that Stephanie had been seen slapping E.A. in the face.  Initially, the Department was unable to locate
Stephanie or E.A., but they found Stephanie later that month, removed E.A. from
her custody, and placed him in foster care. 









In January 2006, the
Department agreed to an order returning E.A. to Stephanie=s custody.  Under the terms of
the order, the Department was appointed as E.A=s temporary managing conservator, and Stephanie agreed that she and
E.A. would live with Weaver and not move without notifying the Department.  Later that month, Stephanie asked for
permission to move out of her father=s house; the Department refused permission.  On February 1, 2006, when attempting to check
on E.A.=s welfare, the Department learned that Stephanie and E.A. had moved
out of Weaver=s home two
days earlier.  The Department did not
locate Stephanie, Joshua, or E.A. until April 1, 2006.  Stephanie performed none of the services
required by her service plan during her two-month absence.  When the Department eventually found
Stephanie and E.A., they were in a house that smelled strongly of
marijuana.  E.A. was dirty, smelled of
marijuana smoke, and had a bruise on his forehead.  Stephanie testified that she and E.A. were
visiting a friend she called ASexy Grandpa@ (she did
not know his real name) and that the smell of marijuana was coming from the
back of the house where some Ayoung teenage kids,@ whom she did not know, were Arunning around.@  The Department again removed E.A. from
Stephanie=s custody
and placed him in foster care. 

Stephanie and Joshua married
in July 2006.  They lived briefly with
Michael Seay, then moved in with the AdamsesCthe paternal grandparents of another of Stephanie=s childrenCfor a few
months.  They next moved into a duplex in
Benbrook, where they lived for less than a month; then they moved back in with
the Adamses.  Finally, in January 2007,
Stephanie and Joshua moved into another house, where they were living at the
time of trial.  Several witnesses
testified that their home was Avery clean@ and Anice.@  In February 2007, they allowed a registered
sex offender, who is a friend of Joshua=s, to live with them.  At the
time of trial, the sex offender had moved out of their home, but was living
four doors down in a nearby duplex. 

Joshua has a history of
assault and domestic violence.  In
addition to the assaults against Stephanie described above, he was convicted of
assault-bodily injury and assault-bodily injury to a family member in 1999 and
2000. 








In 2003, another of Joshua=s children, A.A., was removed from his custody.  This occurred after Stephanie began living
with him.  After the removal, Joshua and
Stephanie moved to Colorado, where E.A. was born; Joshua testified they moved
so he could earn money to hire an attorney. 
His parental rights to A.A. were terminated in May 2004; the grounds for
termination included those set out in family code section 161.001(1)(D) and
(E).  See Tex. Fam. Code Ann. ' 161.001(1)(D), (E).  Before the
Department removed A.A., she told Joshua that someone called ACowboy@ had
attempted to sexually assault her; Joshua did not report the offense. 

At the time of trial,
Stephanie=s fourth and
fifth children were living in Florida with her mother, Bobbie Boyd.  A trial court had appointed Boyd and her
husband to serve as those children=s permanent managing conservators in 2003.  Boyd testified that she and her husband
wanted to be appointed to serve as E.A.=s permanent managing conservators and that they were willing to adopt
him.  A Florida agency had completed a
home study on the Boyds, but the Department had not yet received it at the time
of trial.[2]









Rachael Woods, the Department
caseworker who handled E.A.=s case from May until mid-August 2006, testified that she developed
service plans for Stephanie and Joshua. 
Woods said Stephanie completed her parenting classes and psychological
evaluation.  She testified that Stephanie
and Joshua interacted appropriately with E.A. and that E.A. was bonded to them.


Elizabeth Bowlen was E.A.=s caseworker after mid-August 2006. 
She testified that, in her opinion, although Stephanie and Joshua had
completed parenting classes in August 2006, they had not demonstrated that they
could parent E.A. and that terminating their parental rights was in E.A.=s best interest.  She said that
E.A. was very happy, was Adoing great@ in his foster home, and was very bonded to his foster parents and siblings.  The foster family was interested in adopting
him, but Bowlen said the Department=s plan was adoption by his grandparents, Bobbie and Chris Boyd.  She testified that E.A. was always happy to
see Stephanie and Joshua and had fun playing with them, but he did not treat
them like he treated his foster parents, and he seemed more bonded to his
foster parents. 








Betty Swift was E.A.=s child advocate.  She testified
that she had visited E.A. at his foster home and that he was bonded with his
foster family.  She also observed
supervised visits between Stephanie, Joshua, and E.A.; E.A. was accepting of
their affection, but he did not exhibit any distress when he had to leave at
the end of the visits.  Swift related one
incident during a visitation when Joshua gave E.A. a toy gun that Aevidently . . . shocked [E.A. or] vibrated@ when he pulled the trigger; she said Stephanie and Joshua thought it
was funny.  During another visitation,
Joshua became  irate after Swift told him
he needed to attend anger-management classesChe Ajumped up
and raised his hands in the air and was yelling and walking back and forth@Cand an aide had to remove E.A. from the room. 

In her written recommendation
made and filed on the first day of trial, Swift recommended as follows:

This
Advocate cannot recommend return of [E.A.] to his parents nor support
termination, even though this child advocate recognizes that the grounds for
termination exist.  It is not in the best
interests of [E.A.] to do so.  Based on
the fact that the optimal permanency plan is placement of [E.A.] with his
maternal grandparents Chris and Bobbie Boyd and his other siblings, it appears
to this advocate to be counterproductive to terminate parental rights on this
child alone. 

 








She testified that she was uncomfortable with the
idea of the Boyds adopting E.A. because they had not adopted the other two of
Stephanie=s children
who were in their care (and could not, because Stephanie=s rights as to those children remained intact).  When asked if this last factor pertained more
to the best interests of the other two children, rather than E.A.=s, she replied, ANot
necessarily, because you have to think of all three children.  Even if E.A. were adopted and he had the
[adoptive parents=] name, he=s got to defend that to the other kids, so it=s just as hard on him as the other two that were, quote, never
adopted.@  Ultimately, Swift testified
that she could not make a recommendation regarding termination one way or the
other.  She said that she had told
Stephanie and Joshua that Athe drugs, if nothing else in the world, the drugs will keep them from
their child.@ 

Denise Randall, a permanency
director with the Department, testified that termination of Stephanie=s and Joshua=s parental
rights with regard to E.A., as opposed to appointing the Department as E.A.=s permanent managing conservator, was in E.A.=s best interest because it would open the door for the BoydsCor someone elseCto adopt
him.  Randall said that appointing the
Department to serve as E.A.=s permanent managing conservator was not in E.A.=s best interest because the Department had not yet received the Boyds= Florida home study, and if the study was negative and the Department
could not place E.A. with the Boyds, he might be trapped in the foster care
system for the next sixteen years.  

Dan Greene, a licensed
psychologist, testified that Stephanie and Joshua had attended his anger
management class twice and described their participation as excellent. 








JoAnn Adams and E.J. Adams
are the grandparents and conservators of one of Stephanie=s daughters.  The Adamses are
also the pastors of a church Stephanie and Joshua attend.  JoAnn testified that Stephanie had made
dramatic and rapid improvement lately, and that Joshua Ais a completely different person.@  E.J. said that both Stephanie
and Joshua had made Aunbelievable@ progress and described Joshua=s behavior as Aexcellent.@  JoAnn was unaware of any
recent drug use.  She said she would be
reluctant to return Stephanie=s daughter to her.  Both JoAnn
and E.J. had visited Stephanie and Joshua=s current home and described it as Avery clean@ and Avery neat.@  E.J. said that Joshua had a good job and that
he and Stephanie had a large support group through their church. 

Stephanie=s eldest child, Sara, who was eighteen at the time of trial and the
mother of two children of her own, testified that Stephanie was a good mother,
and while she trusted Stephanie and Joshua with her own children, she would not
at the time of trial allow her children to spend the night with them. 

                                        Procedural History

The Department filed its
petition for termination on December 21, 2005. 
As grounds for termination, the Department alleged that Stephanie and
Joshua knowingly placed or allowed E.A. to remain in conditions or
surroundings, or engaged in conduct or knowingly placed E.A. with persons who engaged
in conduct, which endangered E.A.=s physical or emotional well-being, and that they constructively
abandoned E.A. while he was in the Department=s conservatorship.  See Tex. Fam. Code Ann. ' 161.001(1)(D), (E), (N)
(Vernon Supp. 2007)  On November 21,
2006, the trial court signed an agreed order extending the dismissal date for
the proceeding beyond the one-year statutory deadline.  See id. ' 263.401(b)
(Vernon Supp. 2007).  








On March 29, 2007Cfour days before trialCthe Department filed an amended petition alleging for the first time
as grounds for termination as to Joshua that a court had terminated his
parent-child relationship with another child based on a finding that his
conduct violated family code sections 161.001(1)(D) or (E).  See id. ' 161.001(M) (Vernon Supp. 2007). 
Both Stephanie and Joshua filed motions to strike the pleading as
untimely or, alternatively, for continuance. 
The trial court denied both motions on the first day of trial. 

After a bench trial, the
trial court found by clear and convincing evidence that Stephanie and Joshua
knowingly violated family code sections 161.001(1)(D) and (E); that Joshua had
had his parent-child relationship terminated with respect to another child
based on a finding that his conduct violated sections 161.001(1)(D) or (E); and
that termination was in E.A=s best interest.  The trial
court terminated Stephanie=s and Joshua=s rights to
E.A. and appointed the Department as E.A.=s permanent managing conservator. 
Stephanie and Joshua filed timely statements of points on appeal and
notices of appeal. 

                                             Discussion








In four issues, Stephanie
challenges the factual sufficiency of the evidence to support the trial court=s section 161.001(1) and best-interest findings and argues that the trial
court abused its discretion by allowing the Department to amend its petition on
the eve of trial to allege a prior termination against Joshua.  Joshua makes essentially the same arguments
in three issues and challenges the legal sufficiency to support the trial court=s findings under section 161.001(1).

1.                 
Did the trial court abuse its discretion by allowing
the Department to  amend its termination
petition less than seven days before trial?

 

Stephanie, in her fourth issue, and Joshua, in his
first issue, argue that the trial court abused its discretion by failing to
strike an amended petition filed by the Department four days before trial
without leave of court.  The amended petition
alleged for the first time the prior termination of Joshua=s parent-child relationship with A.A.
as a ground for terminating his parent-child relationship with E.A.  See Tex.
Fam. Code Ann. ' 161.001(1)(M)
(setting out termination of parent-child relationship with another child as
ground for termination). 








Rule 63 of the Texas Rules of
Civil Procedure governs pleading amendments. 
Tex. R. Civ. P. 63.  A party may amend its pleadings at any time
unless the amendment will operate as a surprise; but any pleadings offered for
filing within seven days of trial shall be filed only after leave of court is
obtained.  Id.  We review the trial court=s ruling allowing an amended pleading for an abuse of discretion.  Hardin v. Hardin, 597 S.W.2d 347, 349B50 (Tex. 1980).  A trial court
abuses its discretion when its ruling is arbitrary, unreasonable, or without
reference to any guiding rules or legal principles.  K-Mart Corp. v. Honeycutt, 24 S.W.3d
357, 360 (Tex. 2000).

The trial court has no
discretion to refuse an amendment unless the opposing party presents evidence
of surprise or prejudice or the amendment is prejudicial on its face because,
for example, it asserts a new cause of action or defense.  Greenhalgh v. Serv. Lloyd=s Ins. Co., 787 S.W.2d 938, 939 (Tex.
1990); Hardin, 597 S.W.2d at 349B50.  But merely because an
amended pleading asserts a new cause of action does not make it prejudicial to
the opposing party as a matter of law.  Smith
Detective Agency & Nightwatch Serv., Inc. v. Stanley Smith Sec.,
Inc., 938 S.W.2d 743, 749 (Tex. App.CDallas 1996, writ denied).  An
amendment is prejudicial on its face if (1) it asserts a new substantive matter
that reshapes the nature of the trial itself, (2) the opposing party could not
have anticipated the amendment in light of the prior development of the case,
and (3) the opposing party=s presentation of the case would be detrimentally affected.  Id.; see also Rusk v. Rusk, 5
S.W.3d 299, 309 (Tex. App.CHouston [14th Dist.] 1999, pet. denied).  The burden of showing surprise or prejudice
is on the party resisting the amendment. 
Hardin, 597 S.W.2d at 349. 
A mere allegation of surprise is not a sufficient showing.  La. & Ark. Ry. Co. v. Blakely, 773
S.W.2d 595, 597 (Tex. App.CTexarkana 1989, writ denied).








The Department filed its
original termination petition on December 21, 2005.  The original petition identified another man,
James C., as E.A.=s
presumptive father and therefore did not allege grounds for termination against
Joshua; but an affidavit attached to the petition averred that in addition to
Stephanie=s own
children, A[t]here was
also another child, [A.A.], [who] was removed@ from her home.  The Department
filed its first amended original petition on June 13, 2006, this time
identifying Joshua as E.A.=s father and seeking to terminate his parental rights.  The Department attached the same affidavit to
its amended petition.  The Department
filed its second amended original petition on March 29, 2007Cfour days before the April 2 start of trialCalleging for the first time the termination of Joshua=s parental rights with regard to A.A. as grounds for terminating his
rights with regard to E.A. 








Both Stephanie and Joshua
filed motions to strike the Department=s second amended petition, alleging surprise to the newly-added ground
for termination.  At the hearing on the
motions to strike, Stephanie=s counsel testified that she was surprised by the late allegation and
that both parents were substantially prejudiced because they had no opportunity
to investigate the allegation.  Joshua=s counsel made a similar argument but did not testify.  Stephanie testified that she was living with
Joshua and A.A. when the Department removed A.A. and that she and Joshua moved
to Colorado while A.A. was in foster care. 
She first testified that they learned that Joshua=s parental rights had been terminated when they returned from Colorado
in 2004, but then she said that she did not realize that it was a Afinal@ termination
until a week or so before trial and that their plan Ahas always been to get [A.A.] back.@  She also volunteered that A[w]e=re not
allowed to talk to [A.A.],@ which suggests that she knew that the Department had not simply
removed A.A. from her and Joshua=s home.  The Department=s attorney did not explain why she waited until the eve of trial to
allege the prior termination, but she argued that Stephanie and Joshua could
not show surprise because they both knewCat the very leastCthat the Department had removed A.A. from their home and never
returned her to their care and the affidavits filed with the original and
amended petitions put their counsel on notice of the removal as well.  The trial court denied the motions to strike,
stating on the record that the late-filed amendment did not act as a surprise
because the parents and their attorneys had actual knowledge or notice of A.A.=s removal and that earlier knowledge of the termination would not make
a difference in terms of preparation for trial because if the termination
occurred as alleged, Athe whole
issue is the best interest issue that you have already prepared for.@  








Under the circumstances, we
cannot say that the trial court abused its discretion by denying the motions to
strike.  Stephanie and Joshua alleged
surprise, but Stephanie also testified that she and Joshua learned of the
termination in 2004.  At the very least,
they both knew that the Department had removed A.A. and had never returned her
to their care and that they were prohibited from communicating with her.  Even if Stephanie and Joshua failed to
mention A.A. to their attorneys, the Department=s affidavit put counsel on notice that A.A. had been removed from
their home; thus, the parents and their counsel could have reasonably
anticipated the Department=s prior-termination allegation in light of earlier developments in the
case.  Finally, as the trial court
observed, the late amendment did not detrimentally affect the parties= preparation for trial because if the earlier termination occurred as
alleged, Joshua=s only
defense to the termination of his rights with regard to E.A. was the issue of
E.A.=s best interestCan issue for
which the parties were presumably prepared. 
Therefore, we hold that the trial court did not abuse its discretion by
denying Stephanie=s and Joshua=s motions to strike.  We
overrule Stephanie=s fourth
issue and Joshua=s first
issue.

2.                 
Grounds for termination








In her second and third issues, Stephanie
challenges the factual sufficiency of the evidence to support the trial court=s endangering-surroundings and
endangering-conduct findings.  In his
second issue, Joshua challenges the legal and factual sufficiency of the
evidence to support the trial court=s  endangering-surroundings,
endangering-conduct, and prior-termination findings.

 

a.                  
Standards of Review

A parent=s rights to Athe
companionship, care, custody, and management@ of his or her children are constitutional interests Afar more precious than any property right.@  Santosky v. Kramer, 455
U.S. 745, 758-59, 102 S. Ct. 1388, 1397 (1982); In re M.S., 115 S.W.3d
534, 547 (Tex. 2003).  AWhile parental rights are of constitutional magnitude, they are not
absolute.  Just as it is imperative for
courts to recognize the constitutional underpinnings of the parent-child
relationship, it is also essential that emotional and physical interests of the
child not be sacrificed merely to preserve that right.@  C.H., 89 S.W.3d at
26.  In a termination case, the State
seeks not just to limit parental rights but to end them permanentlyCto divest the parent and child of all legal rights, privileges,
duties, and powers normally existing between them, except for the child=s right to inherit.  TEX. FAM. CODE ANN. ' 161.206(b) (Vernon Supp. 2007); Holick v. Smith, 685
S.W.2d 18, 20 (Tex. 1985).  We strictly
scrutinize termination proceedings and strictly construe involuntary
termination statutes in favor of the parent. 
Holick, 685 S.W.2d at 20-21; In re E.M.N., 221 S.W.3d 815,
820 (Tex. App.CFort Worth
2007, no pet.).








In proceedings to terminate
the parent‑child relationship brought under section 161.001 of the family
code, the petitioner must establish at least one ground listed under
subdivision (1) of the statute and must also prove that termination is in the
best interest of the child.  TEX. FAM. CODE ANN. ' 161.001 (Vernon Supp. 2007); In re J.L., 163 S.W.3d 79,
84 (Tex. 2005).  Both elements must be
established; termination may not be based solely on the best interest of the
child as determined by the trier of fact. 
Tex. Dep=t of Human
Servs. v. Boyd, 727 S.W.2d 531, 533 (Tex.
1987).

Termination of parental
rights is a drastic remedy and is of such weight and gravity that due process
requires the petitioner to justify termination by clear and convincing
evidence.  TEX. FAM. CODE ANN. '' 161.001, 161.206(a); In re J.F.C., 96 S.W.3d 256, 263
(Tex. 2002).  This intermediate standard
falls between the preponderance standard of ordinary civil proceedings and the
reasonable doubt standard of criminal proceedings.  In re G.M., 596 S.W.2d 846, 847 (Tex.
1980); In re C.S., 208 S.W.3d 77, 83 (Tex. App.CFort Worth 2006, pet. denied). 
It is defined as the Ameasure or degree of proof that will produce in the mind of the trier
of fact a firm belief or conviction as to the truth of the allegations sought
to be established.@  Tex.
Fam. Code Ann. ' 101.007
(Vernon 2002).








We must therefore consider
all of the evidence, not just that which favors the verdict.  Id.  But we cannot weigh witness credibility issues
that depend on the appearance and demeanor of the witnesses, for that is the
fact-finder=s
province.  Id. at 573, 574.  And even when credibility issues appear in
the appellate record, we must defer to the fact-finder=s determinations as long as they are not unreasonable.  Id. at 573.

b.                 
Grounds for termination: Stephanie

The trial court found that Stephanie (1) knowingly
placed or knowingly allowed E.A. to remain in conditions or surroundings which
endangered his physical and emotional well-being and (2) engaged in conduct or knowingly placed E.A. with persons who engaged in conduct which
endangered E.A.=s physical
or emotional well-being.  See Tex. Fam. Code Ann. ' 161.001(1)(D), (E). 








Under section 161.001(1)(D),
the environment of a child must be examined to determine if that is a source of
endangerment    to the child.  Id. ' 161.001(1)(D); In re D.T., 34 S.W.3d 625, 632 (Tex App.CFort Worth 2000, pet. denied). 
Under section 161.001(1)(E), the term Aendanger@ means to
expose to loss or injury, to jeopardize.  Boyd, 727 S.W.2d at 533.  Accordingly, when analyzing the trial court=s findings under subsection (E), we must determine whether sufficient
evidence exists that the endangerment of the child=s physical well-being was the direct result of the parent=s conduct, including acts, omissions, or failures to act.  In re D.M., 58 S.W.3d 801, 811B12 (Tex. App.CFort Worth
2001, no pet.).  Termination under
section 161.001(1)(E) must be based on more than a single act or omission; a
voluntary, deliberate, and conscious course of conduct by the parent is
required.  Tex. Fam. Code Ann. ' 161.001(1)(E); D.T., 34 S.W.3d at 634; In re K.M.M.,
993 S.W.2d 225, 228 (Tex. App.CEastland 1999, no pet.). 
However, it is not necessary that the parent=s conduct be directed at the child or that the child actually suffer
injury.  Boyd, 727 S.W.2d at
533.  The specific danger to the child=s well-being may be inferred from parental misconduct standing
alone.  Id.

To determine whether
termination is necessary, courts may look to parental conduct both before and
after the child=s
birth.  D.M., 58 S.W.3d at
812.  As a general rule, conduct that
subjects a child to a life of uncertainty and instability endangers the
physical and emotional well-being of a child. 
In re S.D., 980 S.W.2d 758, 763 (Tex. App.CSan Antonio 1998, pet. denied). 








A pattern of continued drug
use, including drug use during the pregnancy of another child and a parent=s failure to remain drug-free while under the Department=s supervision, will support a finding of endangering conduct under
section 161.001(1)(D) even if there is no direct evidence that the parent=s drug use actually injured the child. 
Vasquez v. Tex. Dep=t of Protective & Regulatory Servs., 190 S.W.3d 189, 196 (Tex. App.CHouston [1st Dist.] 2005, pet. denied) (holding evidence legally and
factually sufficient to support endangering-conduct finding when older sibling
of subject child tested positive for drugs at birth and parent continued to use
drugs after subject child=s birth and
during pendency of Department=s involvement).  A fact-finder
may reasonably infer from a parent=s failure to attend scheduled drug screenings that the parent was
avoiding testing because the parent was using drugs.  In re W.E.C., 110 S.W.3d 231, 239
(Tex. App.CFort Worth
2003, no pet.).   A parent=s engaging in illegal drug activity after agreeing not to do so in a
service plan for reunification with her children is sufficient to establish
clear and convincing proof of voluntary, deliberate, and conscious conduct that
endangered the well‑being of her children.  In re T.N., 180 S.W.3d 376, 383 (Tex.
App.CAmarillo 2005, no pet).  








The record shows that
Stephanie used illegal drugs before E.A. was born, continued to use them after
he was born, and even continued to use drugs during the pendency of the
termination case.  Stephanie testified
that she began using methamphetamine at age twenty and marijuana at age
twenty-three.  Three of her children
tested positive for illegal drugs at birth, one for amphetamine, one for
marijuana, and one for both methamphetamine and marijuana.  Stephanie testified that she used
methamphetamine and marijuana when pregnant with her fifth child.  She denied having used drugs while pregnant
with E.A. but admitted that she used drugs after he was born.  In her psychological evaluation, Stephanie
told the psychologist that she last used marijuana in November 2005, which was
after E.A. was born and before the Department removed him from her care.  In April 2006, the Department found Stephanie
and E.A. in a house that smelled strongly of marijuana smoke.  After E.A.=s removal, Stephanie submitted to only six of twelve requested drug
tests.  One of the hair-follicle tests to
which she did submit was positive for methamphetamine, and another urinalysis
was Aoff-temp.@  Stephanie signed a service plan in June 2006
in which she agreed to Ademonstrate
an ability to stay away from a drug/alcohol lifestyle@; by her own admission, she used methamphetamine after so agreeing.
Stephanie=s mother
testified that Stephanie told her she had smoked marijuana on February 14,
2007, about six weeks before trial.








On the other hand, there is no
direct evidence that Stephanie abused drugs while she was actually caring for
E.A.  The record also shows that
Stephanie completed a drug-counseling class shortly before trial, albeit not a
class approved by the Department.  JoAnn
Adams and E.J. Adams testified that she had made dramatic progress shortly
before trial.  A hair follicle test
conducted about a week before trial indicated that Stephanie had not used drugs
for the prior ninety days.  

In addition to the evidence
concerning Stephanie=s drug use,
the record shows that she changed residences frequently, lived with a convicted
felon while E.A. was in her care, and allowed E.A. to crawl onto the
third-floor balcony of a motel while she slept. 
She also changed residences without the Department=s permission and without telling them where she and E.A. were, and
when the Department located her two months later, she and E.A. were in a house
that smelled strongly of marijuana.

Considering all of the
evidence, including the evidence which contradicts the trial court=s findings, we hold that a reasonable fact-finder could have formed
the conviction that Stephanie endangered E.A.; thus, the evidence is factually
sufficient to support the trial court=s findings under section 161.001(1)(D) and (E).  We overrule Stephanie=s second and third issues.

c.                  
Grounds for termination: Joshua








The prior termination of a parent-child
relationship based on a finding that the parent violated paragraph (D) or (E)
of section 161.001(1) is grounds for the subsequent termination of a parent=s relationship with another child.  Tex.
Fam. Code Ann. ' 
161.001(1)(M).  The trial court admitted
into evidence the order terminating the parent-child relationship between
Joshua and A.A. in 2004,  and the order
states that the trial court found that Joshua violated both paragraphs (D) and
(E) with regard to A.A.  Therefore, the
evidence is both legally and factually sufficient to support the trial court=s finding in the instant case as to paragraph (M).  See In re J.M.M., 80 S.W.3d 232, 243
(Tex. App.CFort Worth
2002, pet. denied) (holding prior termination order that contains paragraph (D)
or (E) findings is legally and factually sufficient to establish grounds for
subsequent termination under paragraph (M)), disapproved on other grounds,
In re J.F.C., 96 S.W.3d 256, 267 (Tex. 2003); see also In re S.A.P.,
169 S.W.3d 685, 706 (Tex. App.CWaco 2005, no pet.) (holding evidence legally and factually sufficient
under paragraph (M) when parent did not challenge fact of prior termination).

Joshua argues that literal
application of paragraph (M) will lead to absurd results that the legislature
did not intend, citing the hypothetical example of a parent whose relationship
with one child is terminated, who thereafter reforms, and whose relationship
with another child is later terminated under paragraph (M) even if the person
has become a Awonderful
parent.@  But section 161.001 guards against
this hypothetical result by requiring a finding that termination is in the
child=s best interest, and the best interest analysisCwhich we conduct in the following section of this opinionCtakes into consideration the concerns Joshua raises in his brief.  See Tex.
Fam. Code Ann. '  161.001.








We hold that the evidence is
legally and factually sufficient to support the trial court=s finding under paragraph (M). 
Because a finding of a violation of a single paragraph of section
161.001(1)Ccoupled with
a finding that termination is in the child=s best interestCwill support
a termination order, we need not consider Joshua=s argument that the evidence is legally and factually insufficient to
support the trial court=s findings
under paragraphs (D) and (E).  See
id.; Tex. R. App. P.
47.1.  We overrule his second issue.

d.                 
E.A.=s
best interest

Prompt and permanent placement of the child in a
safe environment is presumed to be in the child=s
best interest.  Tex. Fam. Code Ann. ' 263.307(a) (Vernon 2002).  There is also a strong presumption that
keeping a child with a parent is in the child=s
best interest.  In re R.R., 209
S.W.3d 112, 116 (Tex. 2006).  Nonexclusive
factors that the trier of fact in a termination case may use in determining the
best interest of the child include:

(1)        the desires of the child;

 

(2)        the emotional and physical needs of the child now and in the
future;

 

(3)        the emotional and physical danger to the child now and in the
future;

 

(4)        the parental abilities of the individuals seeking custody; 

 

(5)        the programs available to assist these individuals to promote
the best interest of the child;








(6)        the plans for the child by these individuals or by the agency
seeking custody;

 

(7)        the stability of the home or proposed placement;

 

(8)        the acts or omissions of the parent which may indicate that
the existing parent‑child relationship is not a proper one; and

 

(9)        any excuse for the acts or omissions of
the parent.

Holley v. Adams, 544 S.W.2d 367, 371B72 (Tex. 1976).

These factors are not exhaustive; some listed
factors may be inapplicable to some cases; other factors not on the list may
also be considered when appropriate.  C.H.,
89 S.W.3d at 27.  Furthermore, undisputed
evidence of just one factor may be sufficient in a particular case to support a
finding that termination is in the best interest of the child.  Id. 
On the other hand, the presence of scant evidence relevant to each
factor will not support such a finding.  Id.  

We will consider the evidence
under each of the Holley factors to determine if it would produce in the
mind of the trier of fact a firm belief or conviction that termination is in
E.A.=s best interest.  See Tex. Fam. Code Ann. ' 101.007.

(1)    E.A.=s desires.








E.A., who was only two years
old at the time of trial, did not testify or verbally express his desires.  The Department argues that testimony that
E.A. accepted his parents= hugs but
did not initiate them and that he was bonded to his foster family supports a
finding that E.A.=s desires
weighed in favor of termination.  But
Rachael Woods testified that E.A. was bonded to Stephanie and Joshua, too, and
the Department did not plan to place E.A. with his foster family.  While the evidence cited by the Department
may be some evidence of E.A.=s desires, it is not clear and convincing evidence.

(2)    E.A.=s emotional and physical needs now and in the future.

As the Department
acknowledges, there was no evidence that E.A. has any special physical needs,
and the child advocate reported that he appeared to be happy, healthy, and
developmentally on target.  The child
advocate also expressed concern that E.A. would be emotionally harmed if the
trial court ordered termination and thereby opened the door for E.A.=s adoption by Bobbie and Chris Boyd, who had custody of but could not
adopt E.A.=s two half
siblings.  The Department points to
Stephanie=s and Joshua=s domestic instability as evidence supporting termination, and that
instability is well established by the record.

(3)    The emotional and physical
danger to E.A. now and in the future.








Some evidence presented at
trial supports the conclusion that immediate reunification between E.A.,
Stephanie, and Joshua might put E.A. in emotional and physical danger now and
in the future.  Foremost among such
evidence is Stephanie=s and Joshua=s long-time drug use and, in Stephanie=s case, the admitted use of illegal drugs during the pendency of this
proceeding, or in Joshua=s case, the
apparent use of drugs suggested by his missed and failed drug tests.  This evidence weighs heavily in favor of
termination.  On the other hand, other
evidence suggests that both parents made rapid if late progress in putting
their drug use behind them.  Similarly,
with regard to Stephanie and Joshua=s history of domestic violence, both were taking anger management
classes, albeit belatedly.

(4)    The parental abilities of
the persons seeking custody.

Neither Stephanie nor Joshua
has exhibited exemplary or even passable parenting abilities in the past.  Stephanie has five other children but has
raised none of them.  Joshua=s relationship with his daughter was terminated.  The 
history of domestic violence, drug use, domestic instability, andCin Stephanie=s  caseCunemployment supports a finding that reunification would not be in
E.A.=s best interest, at least at the present time.  By contrast, the Boyds, with whom the
Department intends to place E.A., have been raising two of Stephanie=s other children for several years. 

(5)    Programs available to assist
those seeking custody.

Our review of the record
finds no significant evidence related to this factor.








(6)    The plans for E.A. of those seeking custody
and

(7)    the stability of the home
or proposed placement.

Bobbie Boyd testified that
she and her husband wanted E.A. to be placed with them and that they were Awilling to consider@ adoption.  Denise Randall
testified that termination of Stephanie=s and Joshua=s parental
rights was in E.A.=s best
interest because the Department had not yet received the Boyds= home study, and if the home study turned out to be negative and the
Department could not place E.A. with the Boyds, termination would allow someone
else to adopt E.A, thus keeping him out of foster care for the next sixteen
years.

Betty Swift, E.A.=s child advocate, recommended placing E.A. with the Boyds permanently
and explained, AI feel like
the child has a good future there.  I
think that he has the siblings there. 
They=ve exhibited
very good parenting skills as far as what we=ve seen with [the other children] here.  I think he needs to be with his siblings.@  But Swift stopped short of
recommending termination, testifying, AI=m still
struggling with it. . . . I wish I could tell you this is exactly what I would
recommend.  I=m sorry.  I can=t do this.@   

(8)    Acts or omissions of the parents which may
indicate that the existing parent-child relationship is not a proper one.

 








We have already detailed the
evidence that may indicate that the existing parent-child relationship between
Stephanie, Joshua, and E.A. is not a proper one, including the parents= drug use, domestic instability, and domestic violence.  More than any other evidence, this evidence
weighs heavily in favor of a finding that termination is in E.A.=s best interest.  On the other
side of scale is the testimony, which makes this a difficult case, that
Stephanie and Joshua have made significant, if belated, changes and
improvements in their lives.

(9)    Any excuse for the acts or omissions of the parents. 

The record does not reflect
any excuses for Stephanie=s and Joshua=s acts and omissions.

Considering all of the
evidence relevant to the Holley factors, including the evidence that
contradicts the trial court=s best-interest findings, we hold that a fact-finder could rationally
have formed a firm belief or conviction that termination of Stephanie=s and Joshua=s parental
rights as to E.A. is in E.A.=s best interest; therefore, the evidence is factually sufficient to
support the trial court=s
best-interest findings.  We therefore
overrule Stephanie=s first
issue and Joshua=s fourth
issue.

                                             Conclusion

Having overruled all of
Stephanie=s and Joshua=s issues, we affirm the trial court=s termination order.

 

 








ANNE GARDNER

JUSTICE

 

PANEL F:    GARDNER, WALKER, and MCCOY, JJ.

 

DELIVERED:
April 24, 2008











[1]See Tex. R. App. P. 47.4.





[2]The
Department later filed the Boyds= home study with the trial
court, and it was filed with this court as a part of the clerk=s
record.  The home study is overwhelmingly
positive and recommends that E.A. be placed with the Boyds.